UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE BROTHERS GROCERY & DELI CORP.,
and BERNARDINO MORA, as Owner,

                      Plaintiffs,

        -against-

UNITED STATES OF AMERICA,

                      Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

20 Civ. 06961 (JCM)

Plaintiffs Bernardino Mora ("Mora") and The Brother's Grocery & Deli Corp. ("Brothers Grocery") (collectively, "Plaintiffs") brought this action pursuant to 7 U.S.C. § 2023(a)(13), (15) and 7 C.F.R. § 279.7 challenging Plaintiffs' permanent disqualification from the Supplemental Nutrition Assistance Program ("SNAP") by the Food and Nutrition Service ("FNS"), a unit of the United States Department of Agriculture ("USDA"). (Docket No. 1) ("Complaint"). Plaintiffs were disqualified from SNAP after the FNS concluded that Plaintiffs trafficked SNAP benefits, as defined in 7 C.F.R. § 271.2.  The United States of America ("Defendant" or "Government") now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss Plaintiffs' Complaint in its entirety. (Docket No. 22). Plaintiffs oppose the motion on the merits, (Docket No. 31) ("Pl. Br."), and alternatively argue that the Court should deny the motion so Plaintiffs can conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(d), (*id.* at 17–20).  For the reasons set forth below, Defendant's motion for summary judgment is granted.[1]

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 15).

# I. BACKGROUND

The following facts are gathered from the parties' 56.1 statements and counterstatements, the exhibits attached to the parties' submissions, and the declarations submitted by the parties in support of their contentions.  The facts are construed in the light most favorable to the non-moving party. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  The facts are not in dispute, unless otherwise noted.

## A.  Factual Background

## 1.  Supplemental Nutrition Assistance Program

SNAP was created through the Food Stamp Act ("FSA") to facilitate "low-income households" in obtaining "a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011.  SNAP is administered by the FNS, a branch of the USDA. (Docket No. 25 ¶ 1) ("Def. 56.1").  At the beginning of each month, "[a] household's SNAP benefits are delivered through electronic benefit transfer [ ("EBT") ] cards." (Docket No. 23 ¶ 4) ("Correy Decl.").  SNAP benefits "may be used to purchase eligible food items at authorized retail stores," called "firms." (*Id.* ¶ 3); *see also* 7 C.F.R. § 271.2.  FNS classifies SNAP-authorized firms based on the firm's characteristics, *e.g.*, "convenience store," "small grocery store," "large grocery store," "superstore." (*Id.* ¶ 14).

EBT cards operate like debit cards. (Def. 56.1 ¶ 3).  "When a SNAP recipient wants to purchase food, retailers swipe the beneficiary's EBT card through an EBT terminal and the recipient enters a personal identification number on a keypad." (*Id.*).  Alternatively, a recipient's EBT account information can be entered manually. (Correy Decl. ¶ 4).  The purchase amount is deducted from the recipient's EBT account and credited to the retailer's bank account. (*Id.*).  The system is entirely cashless. (*Id.*).

Firms participating in SNAP are governed by specific regulations. *See* 7 C.F.R. § 278.6. Firm owners must attest to their familiarity with and intention to adhere to SNAP regulations. (Correy Decl. ¶ 6).  Among other things, participating firms are prohibited from engaging in "'trafficking,' *i.e.*, exchanging SNAP benefits for 'cash or consideration other than eligible food.'" (*Id.* (quoting 7 C.F.R. § 271.2)).  "Trafficking is the most egregious type of SNAP violation" as it "defrauds the taxpayer and thwarts the program's goal of helping low-income families put healthy food on the table." (*Id.* ¶ 8).  A firm may be permanently disqualified from SNAP for a single trafficking violation. 7 C.F.R. § 278.6(e)(1).  However, FNS has discretion to issue a Civil Monetary Penalty ("CMP") in lieu of disqualification if the violating firm submits substantial evidence demonstrating that the firm satisfied the requirements of 7 C.F.R. § 278.6(i). (Correy Decl. ¶ 7).  Among other things, 7 C.F.R. § 278.6(i) "require[s] the presence of an effective compliance program to prevent SNAP violations that was in effect prior to the violations." (*Id.*).

FNS records each transaction at the time of its occurrence and periodically reviews EBT data. (*Id.* ¶¶ 5, 9).  Specifically, FNS uses a computer algorithm called the EBT Anti-Fraud Locator Using Electronic Benefit Retailer Transactions ("ALERT System") to identify "possibly suspicious transaction[s]." (*Id.* ¶ 9).  The ALERT System generates a "flag" when it detects a suspicious transaction, which is stored in the system. (*Id.*).  The system scans approximately 250 million transactions per month and "assigns a numeric score to each store based on the likelihood of trafficking." Kathy Larin *et al.*, *Supplemental Nutrition Assistance Program: Actions Needed to Better Measure and Address Retailer Trafficking*, GOV'T ACCOUNTABILITY OFFICE (December 2018) https://www.gao.gov/assets/gao-19-167.pdf.  "Stores with scores above a certain threshold

are" prioritized for review "based on factors such as average transaction amounts that are excessive for that type of store." *Id.*

When FNS staff discern a pattern of questionable transactions, the case is referred to a Program Specialist within the Retailer Operations Division ("ROD"). (Correy Decl. ¶ 9). The Program Specialist reviews and investigates the flagged transactions by, *inter alia*, arranging for an FNS contractor to visit the firm and comparing the firm's EBT data to that of comparable or nearby firms. (*Id.* ¶¶ 11–12). After reviewing the transactions and gathering information, the Program Specialist generates a report articulating whether the firm more likely than not engaged in trafficking. (*Id.* ¶ 13). This report is given to the FNS Section Chief. (*Id.*). If the Section Chief agrees that trafficking more likely than not occurred, FNS issues a "charge letter" to the firm. (*See id.* ¶ 15); 7 C.F.R. § 278.6(b). The firm may respond to the charge letter and "submit to FNS information, explanation, or evidence" before "FNS makes a final administrative determination" as to whether trafficking occurred. 7 C.F.R. § 278.6(b)(1). The firm can request a CMP in lieu of disqualification. 7 C.F.R. §§ 278.6(b)(2)(i), 278.6(i). After reviewing the charge letter, any response from the firm, and any other available information, FNS issues a trafficking determination. 7 C.F.R. § 278.6(c). The firm is given an opportunity to request administrative review of the determination and may submit additional evidence in support of its position. 7 C.F.R. §§ 278.6(n), 279.4(b). If the administrative review results in an unfavorable determination to the firm, the firm may obtain judicial review in the district court. 7 C.F.R. § 279.7(a).

**2. Investigation of Brothers Grocery**

At all relevant times, Mora owned and operated Brothers Grocery located at 147 McLean Avenue in Yonkers, New York. (Def. 56.1 ¶ 7). FNS approved Mora and Brothers Grocery to participate in SNAP on July 22, 2019. (*Id.* ¶ 8). FNS classified Brothers Grocery as a "small

grocery store." (*Id.*; *accord* A.R.[2] 216).[3]  The store is approximately 2,100 square feet. (A.R.

218).  It has one cash register with an optical scanner, which is surrounded by a 22" x 16"

checkout area. (*Id.*).  There is one specialty register for lottery tickets, one EBT device and no

shopping baskets or carts. (*Id.*).  The store is open from 6:00 a.m. to 10:00 p.m. every day. (A.R.

217).  It does not accept pre-orders or offer delivery, and there is no wholesale business. (A.R.

218).  In addition to having a full deli and kitchen to prepare hot food, Brothers Grocery is "well

stocked with SNAP staple foods" including fresh produce, dairy, frozen foods, juice, cold cuts,

infant formula/baby food, cereal and other pantry items. (A.R. 173, 176, 218; Docket No. 31-6 ¶

19 ("Mora Decl.")).  The store does not sell meat bundles, seafood specials or fruit and vegetable

boxes, and it does not primarily sell one type of food. (Def. 56.1 ¶ 15).

In 2020, the ROD initiated an investigation into Brothers Grocery after finding that the

store's EBT data between August 2019 and January 2020 ("Review Period") "contained patterns

consistent with possible EBT trafficking."[4] (Def. 56.1 ¶ 9; *see also* A.R. 215).  Thereafter, FNS

arranged for a contractor, Patrick Brown ("Brown"), to visit Brothers Grocery on February 15,

2020, to which the store manager, Henry Nunez ("Nunez"), consented. (Def. 56.1 ¶ 10; A.R.

170–76).  Brown "documented the store size and available food items, provided a layout of

---

[2] Refers to the Certified Administrative Record provided by the Government. (Docket Nos. 20–21).  Citations to the A.R. refer to the original pagination therein, not the page numbers assigned by ECF.

[3] Plaintiffs dispute Defendant's contention that "FNS classified Brothers Deli as a small grocery store" on the ground that "Plaintiffs believe it to be bigger than a small grocery store." (Def. 56.1 ¶ 8; Docket No. 32 ¶ 8).  "In connection with its administration of the SNAP, FNS places SNAP-authorized stores into various classifications, depending on the characteristics of the store . . ." (Correy Decl. ¶ 14).  Plaintiff's subjective belief that Brothers Grocery was not "a small grocery store" because "[t]he store has several aisles" and sells "most household items," does not create a dispute as to how FNS classified the store. (*See* Correy Decl. ¶¶ 10, 14).

[4] Plaintiffs' statement that "the transactions cited during the Review Period are not consistent with patterns of possible SNAP benefit trafficking," does not create a dispute regarding whether the ALERT System flagged possibly suspicious transactions. (*See* Def. 56.1 ¶ 9; Docket No. 32 ¶ 9).

public areas of the store, and took photographs of the interior and exterior of the store." (A.R. 170–76).

### i. Program Specialist's March 2020 Report

On March 2, 2020, Georgia Correy ("Correy"), an FNS Program Specialist, prepared an ALERT Case Analysis Document ("March 2020 Report") recommending to the Sector Chief that Brothers Grocery potentially engaged in trafficking. (Correy Decl. ¶¶ 13–14; A.R. 214–36).  In preparing the March 2020 Report, Correy analyzed information gleaned from Brown's store visit, (A.R. 217–19), and EBT data from Brothers Grocery and nearby or comparable stores during the Review Period, (A.R. 220–27).  The March 2020 Report also considered other relevant data, including the average purchase transaction amounts for small grocery stores in Westchester County and New York State, which were $12.11 and $10.81, respectively, during the Review Period. (A.R. 216).

With respect to Brothers Grocery's EBT data, FNS reviewed the 503 transactions that occurred during the Review Period that were over $40.00 ("Eligible Transactions"). (A.R. 220). The March 2020 Report identified three categories of suspicious transactions. (A.R. 220–225). First, FNS identified a "large number" of relatively high-priced transactions "ending in the same cents value," which were inconsistent with the store's pricing structure ("Attachment 1 Transactions"). (A.R. 220–21, 240–41).  Correy opined that the regular occurrence of "transactions that end in a same cent amount" appeared to be "contrived in the absence of any compelling rationale to the contrary." (A.R. 220).  Second, FNS flagged sets of repetitive, large transactions made from the account of a single SNAP household "within short time frames," *i.e.*, 2 minutes to 47.75 hours ("Attachment 2 Transactions"). (A.R. 221–22).  Correy observed that "[m]ultiple transactions, conducted within a set time period, are methods which stores use to avoid single high dollar transactions that cannot be supported." (A.R. 221).  Third, FNS

identified 141 transactions that were unusually large based on "information gathered during the store visit" and "individual household shopping patterns" ("Attachment 3 Transactions"). (A.R. 223–24). Several of these transactions depleted over 99% of the household's monthly SNAP benefits. (*Id.*).

Correy also compared the patterns of transactions at Brothers Grocery to those at nearby stores. (A.R. 225–27). Specifically, Correy evaluated a nearby large grocery store ("Large Grocer"), which was over 5,000 square feet and had 5 shopping carts, 20 handbaskets, and 3 checkout stations with conveyor belts and optical scanners. (A.R. 226). The Large Grocer had a fully stocked deli, made fresh sandwiches, offered a "fully stocked butcher section," and carried "a plethora of fresh produce, dairy and canned/boxed goods." (*Id.*). EBT data showed that Brothers Grocery's dollar volume redemptions were more than $14,000.00 greater than that of the Large Grocer during the Review Period. (*Id.*). Further, Brothers Grocery generated 263 flags during the Review Period, while the Large Grocer generated 17 flags. (A.R. 227). The March 2020 Report ultimately concluded that the evidence supported a preliminary finding that trafficking occurred at Brothers Grocery and recommended that a charge letter be issued. (A.R. 236).

### ii.  Charge Letter

On March 24, 2020, Section Chief Marchee Briant sent Mora a charge letter ("Charge Letter") alerting him to FNS's preliminary finding that Brothers Grocery committed trafficking violations. (A.R. 237). Attached to the Charge Letter was a list of transactions ("Attachment Transactions") that were preliminarily determined to be trafficking violations. (A.R. 240–47). The Charge Letter instructed Mora that he was entitled to reply to the charges and could request consideration for a CMP. (A.R. 238).

### iii.  Response Letter and Additional Correspondence

On April 7, 2020, Mora e-mailed Correy a letter, dated March 28, 2020, responding to the charges against him ("Response Letter"). (A.R. 250–52).  With respect to the Attachment 1 Transactions, Mora reasoned that the store sells many products, such as plantains, juices, snacks, cold cuts and sandwiches "by whole dollar amount." (A.R. 250).  He stated that the majority of the same cent value purchases consisted of "[t]he purchase of any two or three sandwiches and 2 or 3 sodas," which sell for $4.00-$9.00 and $2.50, respectively. (*Id.*).  On the other hand, he explained that Brothers Grocery has a practice of "round[ing] off" purchase amounts "to make it an even number to keep [the customers] satisfied." (*Id.*).  Concerning the Attachment 2 Transactions, Mora averred that he extends in-store credit to loyal customers, who repay the store once they receive their monthly benefits. (A.R. 251).  Mora explained that these customers pay off their balance and then make another purchase shortly thereafter. (*Id.*).  Mora alternatively explained the successive transactions by positing that "after a customer finishes their purchase, they see other items or fresh merchandise coming in and they decide to make another purchase." (*Id.*).  Regarding the Attachment 3 Transactions, Mora explained that Brothers Grocery offers a "full range of groceries" and "[i]t would be easy for a customer to expend their monthly benefits" at the store. (*Id.*).

The Response Letter requested a CMP in lieu of permanent disqualification. (A.R. 252).  Mora argued that the store was eligible for a CMP because he held semi-annual training sessions for all employees to review SNAP regulations. (*Id.*).  Mora attached the following documents to the Response Letter: (1) a confirmation page for the articles of incorporation for "RA JOHNNY'S DELI GROCERY LLC," (A.R. 253); (2) a signed document showing that Mora and three employees attended a December 11, 2019 Mandatory SNAP training, (A.R. 254); (3)

photographs of the store's inventory, (A.R. 255–70); and (4) billing invoices, some of which were illegible, (A.R. 271–450).

FNS wrote to Mora on April 7, 2020 confirming receipt of the Response Letter and warning Mora that accepting SNAP benefits as payment for items sold on credit violates the regulations. (A.R. 455). FNS further requested that Mora provide documentation "to support that food items were purchased on credit" and to "identify specific accounts along with corresponding dates[,] amounts, and items purchased." (*Id.*). On April 8, 2020, Correy wrote to Mora's authorized representative, again asking for documentation for the alleged credit accounts. (A.R. 453). FNS did not receive evidence or documentation from Mora concerning the supposed credit accounts. (Def. 56.1 ¶ 68; Correy Decl. ¶ 29).

## 3. Sanction and Administrative Appeal

Correy considered the evidence in the record from April 7, 2020 to May 4, 2020 and prepared a Retailer Reply and Case Sanction Recommendation regarding Brothers Grocery ("Sanction Recommendation"). (Correy Decl. ¶ 26; A.R. 466–82). The Sanction Recommendation determined that: (1) it was more likely than not that trafficking occurred at the store; (2) the store did not reasonably refute the trafficking allegations; and (3) permanent disqualification from SNAP was an appropriate sanction. (A.R. 482). By letter dated May 11, 2020, Mora was informed of his disqualification from SNAP. (A.R. 483). On May 18, 2020, Mora requested an administrative review of the disqualification determination and renewed his request for a CMP. (A.R. 487). Administrative Review Officer Lorie Conneen ("ARO Conneen") sent Mora a letter on June 3, 2020 informing him of his right to submit additional information in support of his position. (Def. 56.1 ¶ 75). Mora did not submit additional evidence to FNS. (Correy Decl. ¶ 27). On July 28, 2020, ARO Conneen issued a written decision ("Final

Agency Decision") upholding the permanent disqualification of Mora and Brothers Grocery

from SNAP. (A.R. 496–514).

## B.  Procedural History

Plaintiffs commenced the instant action on August 27, 2020 seeking an administrative

stay and *de novo* review of the Final Agency Decision. (Docket No. 1).  On March 18, 2021 the

parties submitted a Civil Case Discovery Plan and Scheduling Order ("Scheduling Order"),

which provided that discovery was "unnecessary" at that time "[g]iven the nature of [the] case."

(Docket No. 18 ¶ 4).  The Scheduling Order set forth a briefing schedule for Defendant's

anticipated summary judgment motion and was so-ordered by the undersigned on March 18,

2021. (*Id.* ¶ 6).  On May 3, 2021, Defendant moved for summary judgment, (Docket No. 22),

which was accompanied by a memorandum of law, (Docket No. 24) ("Def. Br."), Correy's

declaration and Defendant's Rule 56.1 statement.  Plaintiffs opposed summary judgment on July

23, 2021, (Pl. Br.), which was accompanied by Plaintiffs' Rule 56.1 counterstatement of facts,

(Docket No. 32) ("Pl. 56.1"), and supporting exhibits, (Docket Nos. 31-1–31-10).  Defendant

submitted a reply memorandum of law on August 12, 2021, (Docket No. 41) ("Def. Reply"), as

well as the declaration of Mary Ellen Brennan, (Docket No. 37) ("Brennan Decl.").

## II.  SUMMARY JUDGMENT STANDARD

## A.  Federal Rule of Civil Procedure 56(a)

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the

burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396

F.3d 53, 69 (2d Cir. 2005).  The Court must grant summary judgment "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  A genuine dispute as to a material fact "exists for summary judgment purposes where

the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583(LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (internal quotation and citation omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the moving party meets this initial burden, the burden then shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249–50), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

Parties moving for and opposing summary judgment in the Southern District of New York must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Civ. R. 56.1.  The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

## B.  Federal Rule of Civil Procedure 56(d)

"Rule 56(d) gives the court discretion to deny or defer an otherwise supported motion for summary judgment to allow for further discovery if the nonmoving party 'shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition' to the motion." *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 126–27 (S.D.N.Y. 2013) (quoting Fed. R. Civ. P. 56(d)).  The affidavit must include: "(1) the nature of the uncompleted discovery; (2) how the facts sought are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful." *Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).  The nonmoving party must also demonstrate "that the material sought is germane to the defense[] and that it is neither cumulative nor speculative." *Timsina v. United States*, 835 F. App'x 633, 634 (2d Cir. 2020) (quoting *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016)).

## III.  DISCUSSION

### A.  Standard of Review of a Disqualification Determination Based on Trafficking

A SNAP firm aggrieved by a final administrative action of the FNS may obtain judicial review of the agency's decision pursuant to 7 U.S.C. § 2023(a)(13).  Judicial review of a determination by FNS to disqualify a firm from SNAP because of a trafficking violation is a two-step inquiry. *See Muazeb v. United States*, 17cv6754 (DF), 2019 WL 1613433, at *7 (S.D.N.Y. Mar. 28, 2019).  The court first determines in a "trial de novo" whether trafficking occurred at the firm. 7 U.S.C. § 2023(a)(15).  "The Food Stamp Act's de novo review provision . . . 'requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence.'" *Ibrahim v. U.S. Through Dep't of Agriculture*, 834 F.2d 52, 53 (2d Cir. 1987) (quoting *Saunders v. United States*, 507 F.2d 33, 36 (6th Cir. 1974)).  Thus, the court should "not limit its consideration to matters previously appraised in the administrative proceedings." *Nadia Int'l Market v. United States*, 689 Fed. App'x 30, 33 (2d Cir. 2017) (quoting *Ibrahim*, 834 F.2d at 53–54).  Specifically, the district court must determine whether plaintiffs, "as the parties challenging their permanent disqualification from SNAP," have shown by a preponderance of the evidence that the agency's action was "invalid." *Capellan v. United States*, 17 Civ. 9342 (AT), 2020 WL 1047907, at *3 (S.D.N.Y. Mar. 4, 2020) (citing 7 U.S.C. § 2023(a)(16)).  Since FNS may disqualify a firm from SNAP after finding that the firm committed a single trafficking violation, plaintiffs must prove that "*each* cited instance of trafficking" did not occur. *S.S. Grocery, Inc. v. U.S. Dep't of Agriculture, Food and Nutrition Serv.*, 340 F. Supp. 3d 172, 180 (E.D.N.Y. 2018) (quoting *Duchimaza v. United States*, 211 F. Supp. 3d 421, 432 (D. Conn. 2016)) (emphasis added).

Despite the FSA's use of the phrase "trial de novo," summary judgment is a proper method of disposing of an action pursuant to 7 U.S.C. § 2023(a)(13) if no issues of fact are

presented. *See, e.g., Muazeb*, 2019 WL 1613433, at *12 (dismissing store owner's request for judicial review pursuant to 7 U.S.C. § 2023(a)(13) where there was no dispute regarding any material fact and the United States was entitled to judgment as a matter of law); *Arias v. United States*, No. 13 Civ. 8542(HBP), 2014 WL 5004409, at *14 (S.D.N.Y. Sept. 29, 2014) (same).

If the court finds that trafficking occurred, "the second stage of review requires the court to determine whether the agency's imposed sanction was 'arbitrary or capricious, *i.e.*, whether it was unwarranted in law [or] without justification in fact.'" *Muazeb*, 2019 WL 1613433, *8 (quoting *Willy's Grocery v. United States*, 656 F.2d 24, 26 (2d Cir. 1981)).  Whether a penalty is arbitrary or capricious "is a matter of law appropriately determined on a motion for summary judgment." *See Yafaie v. United States*, 94 Civ. 7825 (KMW), 1995 WL 422169, at *1 (S.D.N.Y. July 18, 1995).  Pursuant to this standard, district courts afford substantial deference to agency decisions. *Arias*, 2014 WL 5004409, at *11.  Furthermore, where "the penalty imposed is in accordance with the settled policy of the FNS, it is not arbitrary or capricious." *Yafaie*, 1995 WL 422169, at *1.

**B.  Plaintiffs' Entitlement to Further Discovery Pursuant to Federal Rule of Civil Procedure 56(d)**

Plaintiffs request that the Court deny summary judgment pursuant to Federal Rule of Civil Procedure 56(d) so they can conduct additional discovery. (Pl. Br. at 17–20).  In support of this request, Plaintiffs submit the declaration of their counsel ("Feigenbaum Declaration"). (Docket No. 31-3).  Plaintiffs aver that they did not received access to the Administrative Record until May 3, 2021. (*Id.* at 17–18).  Plaintiffs also argue that they should be permitted to, *inter alia*, depose Correy and potentially ARO Conneen, and access "any program algorithm, or other such computation" utilized to generate ALERT data to ascertain whether the "data sorted and complied by the ALERT System" was "valid[ly]" interpreted by Defendant. (*Id.* at 19).

Plaintiffs additionally seek extensive discovery to demonstrate "through testimony of the store's owner, clerks and yet-to-be-identified SNAP participants[] that regular transactions at the store involved a considerable amount of higher priced items, or a larger volume of moderately priced items." (*Id.*).

The Court denies Plaintiff's request to delay or deny summary judgment so they can conduct additional discovery. At the outset, the record is clear that Plaintiffs received a copy of the Administrative Record on March 3, 2021. (Docket No. 37-1; *see also* Brennan Decl. ¶ 8; Scheduling Order ¶ 5). Furthermore, the parties agreed in the Scheduling Order that the Government would file a pre-discovery summary judgment motion and a briefing schedule was set. (Scheduling Order ¶ 6). The parties expressly stipulated that "[g]iven the nature of this case, *i.e.*, a judicial appeal of the determination of the . . . [FNS] to permanently disqualify Plaintiffs from participation in [SNAP] . . . discovery is unnecessary at this juncture." (*Id.* ¶¶ 4, 6). Plaintiffs did not request discovery at any time thereafter. Since "Plaintiffs chose to proceed directly to summary judgment," they "cannot now be heard to complain about insufficient discovery." *Center for Biological Diversity v. United States Enviro. Protection Agency*, 20-cv-6572 (JSR), 2021 WL 2217870, at *4 n.4 (S.D.N.Y. June 2, 2021) (denying plaintiffs Rule 56(d) motion as "lack[ing] merit" where "[t]he parties agreed to forgo discovery and proceed directly to summary judgment."). Relatedly, the Feigenbaum Declaration fails to demonstrate: (1) what steps counsel took to obtain the discovery he now seeks; and (2) why those efforts were not successful. *See Hoffmann*, 480 F. App'x at 112. Consequently, Plaintiffs' request for additional discovery is denied.[5]

---

[5] The Feigenbaum Declaration contains additional infirmities counseling against allowing further discovery. First, some of the discovery sought by Plaintiffs is ostensibly within their control. For instance, Plaintiffs could have obtained affidavits from Brothers Grocery's store clerks and customers affirming that high-value purchases were common. Second, some of the discovery Plaintiffs seek is not relevant here. For example, the Feigenbaum

## C. *De Novo* Trafficking Determination

The Court must first determine *de novo* whether Plaintiffs have carried their burden of demonstrating that the cited instances of trafficking were "invalid." *See Arias*, 2014 WL 5004409, at *6.

## 1. Reliability of ALERT System

Plaintiffs argue that FNS's decision to issue the Charge Letter was predicated "almost entirely" on "its own interpretation of data from its ALERT system," which Plaintiffs contend is flawed and unreliable. (Pl. Br. at 22–24). In support of this contention, Plaintiffs offer the deposition testimony of Douglas Wilson, an ALERT Program Manager, and a USDA whitepaper titled "Fiscal Year 2017 at a Glance." (Docket Nos. 31-4–31-5; Pl. Br. at 23–24). Plaintiffs allege that these sources demonstrate that the ALERT System, *inter alia*, does not identify fraud on its own, does not have the ability to determine what a "normal" pattern of transactions should be, does not account for atypical shopping patterns or co-shopping, and is not adjusted for inflation. (Pl. Br. at 23–24).

Plaintiffs wholesale attack on the ALERT System does not create an issue of fact precluding summary judgment for several reasons. First, to survive summary judgment, Plaintiffs must show that each of the Attachment Transactions were legitimate purchases. *See SS Grocery*, 340 F. Supp. 3d at 180. Thus, the reliability of the ALERT System as an investigative tool "is simply not relevant to whether Plaintiffs trafficked in EBT benefits because

---

Declaration requests "case studies showing a link between 'trafficking'. . . and 'an excessive number of manual key entered EBT transactions.'" (Docket No. 31-3 ¶¶ 7(i)–7(j)). In the instant case, Brothers Grocery was not charged with conducting "an excessive number of manual key entered EBT transactions." (*See* A.R. 237–47). Similarly, the declaration avers that information identifying household participants involved in the Attachment Transactions is relevant to show that customers shopped "at Plaintiffs' store because of their selection of ethnic foods." (Docket No. 31-3 ¶ 7(d)). It is undisputed that Brothers Grocery does not sell any type of specialty or "ethnic" food products. (Def. 56.1 ¶ 15).

noncompliance or unreliable investigative methods by Agency representatives would neither

fulfill nor excuse Plaintiffs' burden of proof." *Timsina v. United States*, Case No. 2:17-cv-00126,

2019 WL 3254689, at *3 (D. Vt. July 19, 2019) (citing *Tikabo v. United States*, CIVIL ACTION

NO. H-16-2197, 2017 WL 5075275, at *7 (S.D. Tex. Aug. 21, 2017)) (plaintiffs "do not meet

their burden by attacking the computer algorithm utilized to identify patterns of [EBT]

trafficking").  Put another way, even if Plaintiffs' contentions regarding the flaws in the ALERT

System are true, this is not sufficient to show that FNS's trafficking determination was invalid.

*See id.*

Second, Plaintiffs' argument lacks merit because Congress, through the FSA and

regulations promulgated by the USDA, expressly sanction reliance on "evidence obtained

through a transaction report under an [EBT] system," to ascertain whether a firm is trafficking

benefits. 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a).  Courts have routinely reached the same

conclusion. *See Nadia*, 689 F. App'x at 33 (2d Cir. 2017) ("it was entirely proper for FNS to rely

on transaction data alone in making its trafficking determination"); *Timsina*, 2019 WL 3254689,

at *9 (expressly rejecting plaintiffs' argument that the "ALERT program does not accurately

detect trafficking activity and therefore the Agency should not be allowed to rely upon the

ALERT Reports" because it is axiomatic that FNS can rely on ALERT data in making

disqualification determinations).

Third, Defendant did not entirely rely on data generated by the ALERT system in

concluding that trafficking occurred at Brothers Grocery.  ARO Conneen explained in the Final

Agency Decision that the ALERT System "does not, by itself, determine or conclude that

trafficking has occurred." (A.R. 511).  The ALERT system may have catalyzed the investigation

into Brothers Grocery, but the finding of trafficking was premised on Correy's analysis of "the

transaction data and patterns along with other documentation such as, information from the on-site store visit report including photographs of stock and the store layout, an analysis of recipient shopping behavior, and comparisons with similar store types in the local area." (*Id.*; *see also* A.R. 466–82). Thus, as the Government aptly points out, the decision to issue the Charge Letter was not based on flags generated by the ALERT system, but on actual EBT transactions. (Def. Reply at 7).

**2.   Attachment Transactions**

Plaintiffs alternatively contend that the Attachment Transactions are explained by Brothers Grocery's business practices. (Pl. Br. at 25–34). Upon an independent review of the Administrative Record and the evidence presented in this case, the Court concludes that there is ample evidence that Plaintiffs engaged in trafficking.

**i.   Attachment 1 Transactions: Repetitive Occurrence of a Given Cents Value**

Of the 503 Eligible Transactions reviewed by FNS, 45 ended in $.00 or $.50. (A.R. 467). These transactions are likely instances of trafficking because of their high-dollar amounts and Brothers Grocery's pricing structure. During the Review Period, the average transaction price at a small grocery store in New York was $10.81. (A.R. 220). By contrast, 22 of the 45 Attachment 1 Transactions were between $40.00 and $69.99, 11 were between $70.00 and $99.99, 12 were over $100.00, and 1 was for $205.50. (*Id.*). Thus, all 45 transactions were at least 370% greater than the average transaction in New York, and many were significantly larger than that. (*Id.*). Further, Nunez, the store manager, reported that the store did not "have an unusual price structure" and most prices ended in "$.x9" (*e.g.*, $.99, $1.49, $1.29). (A.R. 468). While Mora avers that certain items had prices ending in $.00 or $.50, these items — specifically, cold sandwiches, vegetables, plantains, bread, cookies, chips, juices, bottled drinks, limes and lemons — all sell for less than $9.00. (Mora Decl. ¶ 4). Thus, such high-priced transactions ending in

$.00 or $.50, especially those for over $100.00, do not comport with Brothers Grocery's pricing structure. *See Nadia Int'l Market v. United States*, Case No. 5:14-cv-82, 2015 WL 7854290, at *6 (D. Vt. Dec. 2, 2015) ("The number of even-dollar transactions over the investigative period was . . . indicative of trafficking because the number failed to correspond with Plaintiff's actual pricing" model).

Also noteworthy is the fact that 8 of the 25 Attachment 1 Transactions depleted the transacting household's SNAP balance by 98% or more, which "is outside the norms of SNAP shopping patterns." (A.R. 221).  For example, on August 3, 2019, a beneficiary made a transaction for $192.00, expending 100% of their balance.  On January 5, 2020, a beneficiary used 100% of their balance on a transaction for $104.00, and on January 8, 2020, a recipient used 100% of their SNAP balance on a $194.00 transaction. (*Id.*).  Such high-priced transactions ending in $.00 or $.50 and depleting the vast majority of the transacting household's benefits are likely the result of trafficking.

Plaintiffs dispute FNS's characterization that there were a "large" number of same cents transactions during the Review Period, arguing that only 8.9% of the Attachment 1 Transactions were flagged and that "8.9% of most anything cannot be considered a large number." (Pl. Br. at 25).  However, Plaintiffs do not offer factual support for their contention that there were not a statistically significant number of transactions ending in same cents values to evidence trafficking. (Pl. Br. at 25).  Further, this argument is unavailing as Plaintiffs are tasked with demonstrating that *each* instance of trafficking did not occur, not that most of the Attachment Transactions were legitimate. *See SS Grocery*, 340 F. Supp. 3d at 180.

Plaintiffs also contend that some items sold in the store "including . . . vegetables, plantains, bread, cookies, cakes, chips, juices and various bottled drinks" have prices ending

"with $.00 and $.50." (Pl. Br. at 25–26; Mora Decl. ¶ 4).  Plaintiffs aver that "all cold

sandwiches" are sold "between $4.00-$9.00" and cold cuts are typically ordered "by dollar

amount." (Mora Decl. ¶ 4).  Plaintiffs specifically maintain that the majority of the Attachment 1

Transactions consisted of purchases of several sandwiches and sodas or other items ending in

$.00 or $.50. (*Id.*; A.R. 250).  This is not credible.  Most items sold in the store have prices

ending in $.x9. (A.R. 468).  The items with prices ending in $.00 or .50 are relatively

inexpensive, *i.e.*, under $9.00. (*See* Mora Decl. ¶ 4).  Further, 12 of the 45 transactions were over

$100.00 and 1 transaction was for $205.50. (A.R. 250).  Thus, Mora suggests that customers

routinely purchased a substantial number of low-priced items, *e.g.*, cookies, sodas and chips, and

nothing else.  Indeed, the majority of the Attachment 1 Transactions could not have consisted of

"[t]he purchase of any two or three sandwiches and 2 or 3 sodas." (*See* A.R. 250).  The purchase

of 3 sandwiches for $9.00 each, the highest priced cold sandwich sold at the store, and 3 sodas,

only totals $34.50 and would not have even been flagged as an Eligible Transaction.

Furthermore, Brothers Grocery has a single cash register and a 22" x 16" area to place items for

purchase. (A.R. 218).  The store does not offer hand baskets or shopping carts. (*Id.*).  Therefore,

the store's layout is not conducive to customers purchasing a large volume of items, which Mora

suggests frequently occurred. *Cf Almonte Market v. United States*, Case No. 3:18-cv-30035-

KAR, 2020 WL 93994, at *5 (D. Mass. Jan 8, 2020) (concluding that trafficking occurred where

"there was a single cash register at a small, 'cluttered' checkout counter and there were no . . .

shopping baskets[] or shopping carts that would facilitate the purchase of multiple items in a

single transaction for the alleged large-dollar amounts").

      Plaintiffs also contend that as "a courtesy to . . . loyal customers," Brothers Grocery "will

take the total purchase price and round down to the nearest $.00 or $.50," *e.g.*, "[i]f a purchase is

for $54.57, the price would be rounded down to $54.50." (Pl. Br. at 26; Moral Decl. ¶ 6). However, Nunez reported to FNS that the store did not have a policy of rounding transaction totals. (A.R. 170).  Furthermore, the examples provided by Mora, *i.e.*, that the store may round a purchase from $75.15 to $75.00 or from $54.57 to $54.50, "as a courtesy to [the store's] loyal customers," do not seem realistic.  The foregoing discounts of $.15 and $.07 constitute markdowns of approximately 0.2% and 0.1%, respectively.  It is not believable that Brothers Grocery rewarded its "loyal" customers with a discount of a fraction of a percent or that this "generate[d] good-will toward the store." (*See* Mora Decl. ¶ 8).  Further, the record is devoid of evidence, such as an affidavit from a customer or store clerk, corroborating the existence of such a policy.  Moreover, only 45 of the 503 transactions flagged by FNS ended in same cents values. If Brothers Grocery actually had a policy of rounding transaction totals, one might expect that more than 45 of the transactions would have ended in $.00 or $.50.

## ii.  Attachment 2 Transactions: Repetitive Transactions in a Set Period of Time by Same Household/Account

The most compelling evidence of trafficking is the large, successive transactions made by a single household in a short period of time.  FNS identified 22 sets of large transactions made within 48 hours of each other by 11 different households, totaling $4,148.64 in SNAP benefits. (Def. 56.1 ¶ 26).  Of the 22 sets of transactions identified, the average amount of SNAP benefits expended per set was $188.57. (*Id.* ¶ 29; A.R. 242–44).  In one example, a single household ("Household") made three sets of transactions during the Review Period, all of which depleted the Household's benefits by over 75%. (A.R. 235).  On September 7, 2019 at 7:23 p.m., the Household spent $172.50 at Brothers Grocery. (*Id.*).  Approximately five hours later, at 12:09 a.m. on September 8, 2019, the Household made another purchase for $167.20. (*Id.*).  Thereafter, at 6:14 p.m. on September 8, 2019, approximately 18 hours after the previous transaction, the

Household spent $161.84 at the store. (*Id.*).  On September 9, 2019 at 4:09 p.m., the Household

spent $228.75. (*Id.*).  In total, the Household spent $730.29 at the store in a 45-hour period. (*Id.*).

In December 2019, that Household spent $457.18 in three transactions, for $136.00, $145.72 and

175.46, respectively, within 24 hours. (*Id.*).  In January 2020, the Household made two large

purchases for $225.10 and 185.00 in less than 7 hours. (*Id.*).  The Household's average

transaction at Brothers Grocery during the Review Period was approximately 777% greater than

the average transaction at a small grocery store in New York. (A.R. 234).

Additionally, another household conducted two transactions at Brothers Grocery, totaling

$110.52, in approximately 2 minutes. (A.R. 242).  These successive transactions, made close in

time to other transactions by the same household, likely demonstrate "an often-used method to

avoid detection of trafficking: conduct[ing] multiple small transactions in a short period of time

to avoid single high dollar transactions that cannot be supported." *SS Grocery*, 340 F. Supp. 3d at

181 (internal quotation omitted).  Indeed, it seems unlikely that a household would engage in

four separate transactions at Brothers Grocery, totaling $730.29, in just 45 hours.  Nor would a

legitimate customer spend $70.25 at Brothers Grocery, only to spend $40.27 two minutes later.

(A.R. 242); *see Muazeb*, 2019 WL 1613433, at *9 (finding that "the evidence of the notable

number of repetitive transactions, occurring within a short period of time, and of the high dollar

amounts of many of those transactions" was "convincing" evidence of trafficking).

Furthermore, several of the flagged transactions exhausted most of the transacting

household's benefits early in the month. (*See* A.R. 235).  For example, the Household discussed

above depleted 76.96% of its benefits in the first ten days of September, 97.94% of its benefits in

the first four days of December, and 80.43% of its benefits in the first two days of January. (A.R.

235).  "According to the USDA Office of Research and Analysis[]," the "average SNAP

recipient gradually exhausts his or her benefits over the course of one month." *SS Grocery*, 340

F. Supp. 3d at 181 (citing Laura Castner and Juliette Henke, U.S. Dep't of Arg., Food and

Nutrition Service, Office of Research and Analysis, *Benefit Redemption Patterns in the*

*Supplemental Nutrition Assistance Program*, 11 (Feb. 2011) https://fns-

prod.azureedge.net/sites/default/files/ARRASpendingPatterns.pdf.).  Based on the inventory

offered by Brothers Grocery, it is unlikely that households would diverge from normal shopping

patterns and expend such a large amount of their benefits at the Store, so early in the month, for a

legitimate purpose.

    Plaintiffs offer various explanations for the Attachment 2 Transactions.  First, Plaintiffs

allege that they can be explained by "co-shopping," where a beneficiary makes a purchase "and

then give[s] their EBT card to a family member, such as a child etc., to make another purchase

not only in that same trip to the store, but later in the day." (Mora Decl. ¶ 11).  Plaintiffs also

aver that some of their customers purchase food for each meal of the day from the store at

separate times. (*Id.* ¶ 9; Pl. Br. at 28).  While it is entirely plausible that an individual or

members of a household would frequent the same store several times over the course of a few

days, this does not explain the high dollar amount of the flagged transactions. *See Muazeb*, 2019

WL 1613433, at * 9 (rejecting retailer's explanation that the flagged transactions can be

explained by households purchasing multiple meals in one day from the firm where "the pattern

of repetitive transactions simultaneously reflects a pattern of transactions at higher-than-average

prices.").  It is simply not credible that a consumer's expenditure of over $730.00 in less than

two days at a small grocery store can be explained by that consumer returning to Brothers

Grocery to purchase more than one of their daily meals.  Nor is it believable that different

members of a single household made such large transactions, from the same small grocer, so close in time to one another, for "logistical" or "budgeting" reasons. (*See* Pl. Br. at 28).

Second, Plaintiffs contend — ostensibly with respect to the transactions that occurred within 2 minutes of each other — that the store's employees are "highly knowledgeable with respect to the store's pricing" and therefore can "process all transactions in quick succession." (*See* Mora Decl. ¶ 10).  It is not likely that the store's employees memorized the prices of all of Brothers Grocery's inventory so they could process transactions in quick succession.  Even if they had, manually imputing these prices would not be quicker than using the store's optical scanner.  Thus, the employee's knowledge of the store's prices does not credibly explain how $110.52 of merchandise was processed in two separate transactions in just two minutes. (*See* A.R. 242).

Third, Plaintiffs aver that the store extended lines of credit to loyal customers.  Plaintiffs explain that customers to whom credit was extended paid off their balance from the previous month and then made a purchase, leading to two large transactions made close in time to each other. (Pl. Br. at 29).  Specifically, Plaintiffs allege that this explains the transactions in which $110.52 of SNAP-eligible items were processed within two minutes. (Mora Decl. ¶ 20). Plaintiffs argument fails as a matter of law because "USDA regulations prohibit retail food stores from accepting benefits in payment for items sold on credit, even if the debt relates to SNAP-eligible food items." *183 Bronx Deli Grocery Corp. v. U.S.*, No. 11 Civ. 1527 (PGG), 2012 WL 2359664, at *1 (S.D.N.Y. June 18, 2012); *accord Arias*, 2014 WL 5004409, at *10 (rejecting plaintiffs explanation that flagged transactions were the repayment of debts by customers

because "firms are prohibited . . . from accepting SNAP benefits as 'payment for items sold to a household on credit.'") (quoting 7 C.F.R. § 278.2(f)). [6]

### iii. Attachment 3 Transactions: Large Purchase Transactions from SNAP Households

Plaintiffs fail to dispute the factual basis for FNS's conclusion that several large transactions depleting most of the transacting household's SNAP allotment were instances of trafficking.  The average small grocery store transaction amount during the Review Period in New York was $10.81. (A.R. 223).   During the Review Period, Brothers Grocery "conducted approximately 34 more transactions, with a dollar value that was $4,056.87 greater than the average [small grocery store] in [New York]." (A.R. 228).   Further, 141 of the Eligible Transactions were higher than 85% of all small grocery store transactions in the state. (*Id.*).  The "most significant differences" concerned transactions for "$70.00 – 79.99, $100.00 – 109.99, and all of the transactions that were over $160.00." (*Id.*).   In essence, Brothers Grocery conducted significantly more of the largest transactions tracked by FNS than comparator firms. (*See id.*).   Standing alone, this may be explicable.   However, seven of these transactions, which were for $104.00, $68.00, $165.00, $70.00, $194.00, $192.00 and $48.23, depleted the household's SNAP account by at least 99%. (*Id.*).   All of these seven transactions took place during the first ten days of the month, and all but one of the transactions ended in an even dollar figure. (*See id.*).

Further, the number of large transactions effectuated at Brothers Grocery, especially those for over $160.00, are unusual when compared to data from the nearby Large Grocer, which is over

---

[6] In opposing summary judgment, Plaintiffs submit an undated document labeled "The Brothers Grocery Credit Summary Report," ("Credit Summary Report") which purports to track credit extended to 7 households during the Review Period. (Docket No. 31-7).  It is not clear to the Court precisely when the Credit Summary Report was created, but it appears to have been made after the Review Period in connection with the instant litigation.  Plaintiffs alleged at the administrative level that the suspicious transactions were explained by customers repaying extensions of credit. (A.R. 504).  However, despite being asked to produce documents corroborating the alleged credit extensions on April 7, 2020 and April 8, 2020, (A.R. 453, 455), Plaintiffs did not produce any such corroboration.  Nevertheless, Mora submitted other evidence in his possession to FNS.  Had the Credit Summary Report existed during the Review Period, it would have likely been produced to FNS.

double the size of Brothers Grocery and carries SNAP inventory that "is superior [to Brothers Grocery] in every category." (A.R. 226). The Large Grocer has 5 shopping carts, 20 handbaskets and 3 checkout stations with conveyor belts and optical scanners, thus making "the checkout process . . . much easier for large purchases." (*Id.*). The Large Grocer takes telephone orders and offers delivery service. (*Id.*). It has a fully stocked butcher section, which Brothers Grocery does not. (*Id.*). Nevertheless, during the Review Period, Brothers Grocery "had a dollar value of redemptions that was $14,454.52 greater than that of [the Large Grocer]." (*Id.*). Brothers Grocery generated 263 flags during the Review Period, while the Large Grocer only generated 17. (*Id.*).

Moreover, FNS determined that the households that made suspicious purchases at Brothers Grocery also shopped at other, larger grocers during the same day or week that they patronized Brothers Grocery. (A.R. 231–36). These households spent significantly more at Brothers Grocery. (*See id.*). For example, one household spent $24.02 at a medium sized grocery store and later that day, made two transactions at Brothers Grocery for $225.10 and $185.00, respectively. (A.R. 236).

Plaintiffs argue that Brothers Grocery's inventory supports the high-priced transactions. (Pl. Br. at 30). Plaintiffs contend that the on-site inspector only considered the inventory he visually observed, and that Brothers Grocery had additional stock that would support the large purchases made at the store. (Pl. Br. at 32). Plaintiffs provide a "sample transaction" showing how a customer "can easily reach a total transaction value of nearly $170.00 by purchasing" a variety of items. (Mora Decl. ¶ 19). However, the fact that the store "had enough inventory to support the volume of redemptions," (A.R. 479; *see also* A.R. 271–450) — which it ostensibly had — does not raise a dispute as to whether the Attachment 3 Transactions were trafficking violations. Plaintiffs do not address any of the Attachment 3 Transactions, let alone explain why

the transacting households did not make such large purchases at the larger grocery stores where they shopped. (A.R. 231–36, 479).

Plaintiffs further contend that many of its customers do not have cars to drive to larger grocery stores and thus "there is a tendency for large transactions." (Pl. Br. at 33). Plaintiffs' argument is belied by the record. Several households that conducted suspiciously large transactions at Brothers Grocery also patronized larger grocery stores that same day or during the same week. (A.R. 231–36).

Finally, Plaintiffs argue that only 20 of the 141 flagged purchases were over $110.00, which was not a high number of "excessively large transactions" as FNS concluded. (Pl. Br. at 32). This argument is not persuasive since permanent disqualification is an appropriate punishment for even a single instance of trafficking. 7 C.F.R. §278.6(e)(1). Also, since the average transaction at a small grocery store in New York was $10.81 during the Review Period, (A.R. 216), Plaintiffs' argument that only transactions over $110.00 can be considered "large" has no basis in fact.

In conducting a *de novo* review of the administrative record, I have considered the Attachments along with information gleaned from the on-site inspection and data from comparator and nearby firms. I find that there is ample evidence to support the conclusion that Brothers Grocery engaged in trafficking on numerous occasions and that Plaintiffs have failed to adduce evidence rebutting this well-supported conclusion. Having found there is sufficient support for the determination that Plaintiffs engaged in trafficking, the Court turns to the second inquiry: whether FNS's decision not to impose a CMP in lieu of disqualification was arbitrary or capricious. *See Willy's Grocery*, 656 F.2d at 26.

**D.  The Determination That Plaintiffs Were Not Eligible for a CMP Was Not Arbitrary or Capricious**

"Pursuant to 7 U.S.C. § 2021(b)(3)(B), FNS has 'the discretion to impose a civil penalty . . . in lieu of disqualification.'" *Arias*, 2014 WL 5004409, at *11.  The applicable regulation provides that to be eligible for a CMP, the firm must "at a minimum" establish its fulfillment of each of the following criteria by "substantial evidence:"

> Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and
>
> Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and
>
> Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm. . . .

7 C.F.R. § 278.6.  Furthermore, the "regulations . . . set out the supporting documentation that the FNS requires and will consider" in determining whether these criteria are satisfied. *21871 Hempstead Food Corp. v. United States*, No. 14 Civ. 00006(ILG), 2014 WL 4402069, at *3 (E.D.N.Y. Sept. 4, 2014).

> As to the existence of an effective compliance policy, 'FNS shall consider written and dated statements of firm policy.'  As to the existence of the policy before the violations occurred, 'policy statements shall be considered only if documentation is supplied which establishes that the policy statements were provided to the violating employee(s) prior to the commission of the violation.' And as to the existence of an effective personnel training program, 'A firm which seeks a civil money penalty in lieu of a permanent disqualification shall document its training activity by submitting to FNS its dated training curricula and records of dates training

> sessions were conducted; a record of dates of employment of firm
> personnel; and contemporaneous documentation of the
> participation of the violating employee(s) in initial and any follow-
> up training held prior to the violation(s).'

*Id.* (quoting 7 C.F.R. §§ 278.6(i)(1)–(2)).

At the administrative level, Plaintiffs submitted a single document signed by Mora and three employees regarding a SNAP training session held on December 11, 2019, which was held during the Review Period. (A.R. 513). Based on this showing, FNS determined that Plaintiffs failed to, *inter alia*, submit sufficient evidence demonstrating that Brothers Grocery had an effective compliance program in place "prior to the occurrence of violations cited in the charge letter," as is required for a CMP. (A.R. 513–14).

In support of their opposition to summary judgment, Plaintiffs submit new evidence, which was not presented at the administrative level, specifically: (1) an undated compliance/training policy, (Docket No. 31-8), which Mora alleges went into effect in the summer of 2019, (Mora Decl. ¶ 22); (2) signed statements of SNAP employees stating that they received regular SNAP training and were trained prior to their first shift at the store, (Docket No. 31-8); and (3) purported sign-in sheets for SNAP trainings on August 2019 and January 2020, (Docket No. 31-10).

It is well-settled that "[t]he standard of review for the imposition of a [food stamp program] sanction is a determination whether the Secretary's action was arbitrary or capricious." *Cf El Tepeyac Grocery, Inc. v. U.S.*, 515 Fed. App'x 55, 56 (2d Cir. 2013) (rejecting plaintiffs' argument that the district court should have reviewed the sanction imposed by FNS by "conducting a trial *de novo*") (quoting *Willy's Grocery*, 656 F.2d at 26. Accordingly, the district court must determine whether the agency "relie[d] on

- 29 -

factors that Congress did not intend it to consider, fail[ed] to consider an important factor, or offer[ed] an explanation for its decision that [was] contrary *to the evidence before [it]*" in determining that a CMP should not be imposed. *Arias*, 2014 WL 5004409, at *11 (quoting *Connecticut Dep't of Pub. Util. Control v. FCC*, 78 F.3d 842, 849 (2d Cir. 1996)) (emphasis added).  Thus, the evidence Plaintiffs now offer, which was not before the agency, has no bearing on the district court's review of whether the agency's decision was arbitrary or capricious. *See id.*

The Court finds that the agency's decision was not arbitrary or capricious. Plaintiffs concede that the only evidence presented at the administrative level was a one-page document confirming that a SNAP training was held in December 2019. (Pl. Br. at 36).  This does not show that an effective compliance program was in place before the Attachment Transactions, because the Review Period began in August 2019.  Thus, FNS's decision not to impose a CMP because Plaintiffs failed to satisfy 7 C.F.R. § 278.6 was consistent with the evidence presented to the agency. *See Arias*, 2014 WL 5004409, at *11.  Moreover, FNS's decision was in accordance with applicable regulations, which clearly set forth the documentation a firm must produce to be considered for a CMP. 7 C.F.R. § 278.6(i)(1)–(2); *see Yafaie*, 1995 WL 422169, at *1 (citing *Lawrence v. U.S.*, 693 F.2d 274, 277 (2d Cir. 1982) (action was not arbitrary or capricious where policy implemented by FNS "(1) [was written] down and (2) use[d] . . . all the time and against everyone")).  Since FNS's decision conformed to agency regulations, it was not arbitrary or capricious. *See Arias*, 2014 WL 5004409, at *13 (FNS's decision to permanently disqualify firm from SNAP was not arbitrary or capricious because it "comported with the applicable regulations" where "plaintiffs did traffic in SNAP benefits and failed to

establish, by 'substantial evidence,' the four criteria necessary to make them eligible for a CMP").

Furthermore, the record indicates that Mora knew during the administrative proceedings that an effective compliance program was a prerequisite to a CMP. Mora stated in the Response Letter that he "hold[s] semiannual training sessions" to review SNAP rules and submitted the December 2019 training sign-in sheet to FNS. (A.R. 252). Plaintiffs do not, however, offer any explanation for why the evidence submitted in opposition to summary judgment — which was allegedly created before the administrative proceedings commenced — was not produced to FNS in the first instance. For the foregoing reasons, the Court finds that the agency's decision to disqualify Plaintiffs from SNAP was not arbitrary or capricious. Accordingly, Defendant is entitled to summary judgment and Plaintiffs' claims are dismissed in their entirety.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk is respectfully requested to terminate the pending motion (Docket No. 22) and close the case.

Dated:    September 28, 2021
          White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge